885 So.2d 453 (2004)
DEPARTMENT OF STATE, DIVISION OF ELECTIONS, Appellant,
v.
Joseph MARTIN, et al., Appellees.
No. 1D04-4517.
District Court of Appeal of Florida, First District.
October 25, 2004.
*454 Charlie Crist, Attorney General; Jonathan A. Glogau, Chief, Complex Litigation; Erik M. Figlio, Deputy Solicitor General, Tallahassee, for Appellant.
Jennifer S. Blohm of Meyer and Brooks, P.A., Tallahassee, for Appellees.
Elizabeth McArthur and Christopher B. Lunny of Radey Thomas Yon & Clark, P.A., Tallahassee; Richard E. Coates, Tallahassee, for Jim Smith and George Firestone, Amici Curiae.
WEBSTER, J.
The Department of State, Division of Elections, seeks review of a final order entering a mandatory injunction directing the Division to (1) permit a Democratic candidate for Congress to withdraw; (2) immediately notify the appropriate Democratic Party officials of their right to designate a nominee to fill the vacancy thereby created; and (3) if the Democrats designate a nominee at least 21 days before the general election, comply with the requirements of section 101.253(3), Florida Statutes (2004), for placing the nominee on the ballot. We affirm.

I.
James R. Stork qualified with the Division as the Democratic Party's candidate for the Florida Congressional District 22 seat in the 2004 general election, which is to take place on November 2nd. On September 23rd, some 40 days before the date of the election, the Division received from Stork a sworn notice, stating that he wished to withdraw as a candidate. Six days later, the Division informed Stork that, "in the interest of avoiding disruption and confusion," he would not be permitted to withdraw, citing section 101.253(2), Florida Statutes (2004), as its justification. Section 101.253(2) reads:
No candidate's name, which candidate is required to qualify with the Department of State for any primary or general election, shall be printed on the ballot if such candidate has notified the Department of State in writing, under oath, *455 on or before the 42nd day before the election that the candidate will not accept the nomination or office for which he or she filed qualification papers. The Department of State may in its discretion allow such a candidate to withdraw after the 42nd day before an election upon receipt of a written notice, sworn to under oath, that the candidate will not accept the nomination or office for which he or she qualified.

(Emphasis added.) On October 5th, appellees (who are members of the Congressional District 22 Democratic Party Executive Committee) commenced this action, seeking (among other things) a mandatory injunction requiring the Division to declare that a vacancy was created by Stork's withdrawal and to comply with section 100.111(4)(b), Florida Statutes (2004), so that the Democratic Party might designate a nominee to fill the vacancy. To the extent pertinent, section 100.111(4)(b) reads:
If the vacancy in nomination occurs later than September 15,... no special primary election shall be held and the Department of State shall notify the chair of the appropriate state, district, or county political party executive committee of such party; and, within 7 days, the chair shall call a meeting of his or her executive committee to consider designation of a nominee to fill the vacancy. The name of any person so designated shall be submitted to the Department of State within 14 days of notice to the chair in order that the person designated may have his or her name printed or otherwise placed on the ballot of the ensuing general election, but in no event shall the supervisor of elections be required to place on a ballot a name submitted less than 21 days prior to the election. If the vacancy occurs less than 21 days prior to the election, the person designated by the political party will replace the former party nominee even though the former party nominee's name will be on the ballot. Any ballots cast for the former party nominee will be counted for the person designated by the political party to replace the former party nominee....
On the morning of October 8th, the trial court held a hearing on the request for an injunction. The parties agreed that any order entered by the trial court would be the final order in the case. At the hearing, the Division presented undisputed evidence that it would be extremely difficult to change the ballots so close to the election, and that any request to do so would be disruptive because absentee ballots had already been sent out, it would take three weeks to produce new paper ballots, and parts of the district had recently begun using touch-screen voting machines, which could not be reprogrammed and tested in fewer than five weeks. At oral argument, counsel for the Division candidly conceded that the same problems would have existed had the Division received Stork's notice two days earlier, but that the Division would have been required by the first sentence of section 101.253(2) to permit Stork to withdraw, and to initiate the replacement procedure set out in section 100.111(4)(b).
Following the hearing, the trial court entered its "Final Order Granting Temporary and Permanent Injunction." In that order, the trial court acknowledged that the outcome of the case turned on the interplay between sections 101.253(2) and 100.111(4)(b). It noted that section 100.111(4)(a) and (b), together, provide that death, withdrawal, resignation or removal of a candidate results in a vacancy in the nomination, and that paragraph (4)(b) "then provides a detailed procedure that must be implemented when a vacancy occurs." Moreover, the trial court concluded *456 that it was clear from that paragraph that the legislature anticipated the possibility that such vacancies might occur all the way up to the day of the election. It rejected the Division's argument that the second sentence of section 101.253(2) gave the Department the discretion to deny permission to withdraw because the request was made fewer than 42 days before the election, stating that the statute supplied no criteria for the exercise of the discretion delegated to the Department and that, without expressed criteria, there was nothing to prevent the Department from basing its decision on any reason, or no reason. It concluded its analysis with the following:
Here, the statutes can be harmonized. Section 100.111(4)(b) provides the procedures that must be followed when a candidate withdraws after September 15th. To read Section 101.253(2) as the Department urges would essentially render Section 100.111(4)(b) meaningless and a nullity. Further, the Court must read these statutes in a manner that preserves their constitutionality. Under Article II Section 3 of the Florida Constitution, the Legislature "... may not delegate the power to enact a law or the right to exercise unrestricted discretion in applying the law." Sims v. State, 754 So.2d 657, 668 (Fla.2000). Statutes granting power to the executive branch of government "must clearly announce adequate standards to guide ... in the execution of the powers delegated. The statute must so clearly define the power delegated that the [executive] is precluded from acting through whim, showing favoritism, or exercising unbridled discretion." Bush v. Shiavo [sic], [___ So.2d ___,] 2004 WL 2109983 (Fla.S.Ct. Sept. 23, 2004); see also Askew v. Cross Key Waterways, 372 So.2d 913 (Fla.1978).... [T]here are no such standards in Section 101.253(2). The Court must therefore find that the specific procedures set forth in Section 100.111(4)(b) govern the decision here.
Accordingly, the trial court entered a mandatory injunction directing the Division to (1) permit Stork to withdraw; (2) immediately notify the Congressional District 22 Democratic Party Executive Committee of their right to designate a nominee to fill the vacancy thereby created; and (3) if the Executive Committee designates a nominee at least 21 days before the general election, comply with the requirements of section 101.253(3), Florida Statutes (2004), for placing the nominee on the ballot. This appeal follows. Our standard of review is de novo. See, e.g., Racetrac Petroleum, Inc. v. Delco Oil, Inc., 721 So.2d 376, 377 (Fla. 5th DCA 1998) ("judicial interpretation of Florida statutes is a purely legal matter and therefore subject to de novo review"); City of Miami v. McGrath, 824 So.2d 143, 146 (Fla.2002) (whether a statute is facially unconstitutional is a pure question of law, subject to de novo review).

II.
"[L]egislative intent is the polestar that guides a court's statutory construction analysis." State v. J.M., 824 So.2d 105, 109 (Fla.2002) (citations omitted). Accordingly, we must begin our analysis by attempting to determine the intended interplay (if any) between section 101.253(2) and section 100.111(4)(b). In this effort, we are grateful for the assistance of amici curiae, Jim Smith and George Firestone, both of whom are former Secretaries of State. We agree with their position that the legislature intended that section 101.253 would govern when and how a candidate may seek to withdraw his or her name from nomination and be removed from the ballot. Section 100.111 was intended to address the next step. If a candidate timely submits a request to *457 withdraw (or the Department, in its discretion, grants an untimely request), a vacancy arises. Section 100.111(4)(b) addresses the process to be used to fill that vacancy. (Section 100.111(4) also addresses the process to be used to fill vacancies caused by circumstances other than withdrawal, such as death or removal.) This determination does not, however, end our inquiry. We must next decide whether the second sentence of section 101.253(2) amounts to an unconstitutional delegation of legislative power to the Department.

III.
If at all possible, we must construe a statute in such a way as to uphold its constitutionality. E.g., St. Mary's Hosp., Inc. v. Phillipe, 769 So.2d 961, 972 (Fla.2000). However, our duty to apply this presumption is dependent on our being able to arrive at a fair construction that is consistent with the federal and state constitutions, as well as legislative intent. E.g., State v. Elder, 382 So.2d 687, 690 (Fla.1980). If we are unable to arrive at a fair construction that will achieve such a result, we have a duty to declare the legislation "`to be in conflict with the Constitution and, to the extent of such conflict, to be invalid.'" Lewis v. Bank of Pasco County, 346 So.2d 53, 55 (Fla.1977) (on motions for clarification and to appear as amicus curiae and for rehearing).
Appellees maintain that, because it gives the Department unbridled discretion, the second sentence of section 101.253(2) amounts to an unconstitutional delegation of legislative power to the Department, in violation of article II, section 3 of the Florida Constitution, which prohibits any "person belonging to one branch [from] exercis[ing] any powers appertaining to either of the other branches unless expressly provided" by the constitution. Florida courts have on many occasions addressed whether legislation violates the prohibition contained in article II, section 3. We find our supreme court's opinion in Lewis v. Bank of Pasco County, 346 So.2d 53 (Fla.1977) (on motions for clarification and to appear as amicus curiae and for rehearing), particularly enlightening.
In Lewis, a statute provided that, notwithstanding the Florida Public Records Act, bank documents maintained by the Division of Banking of the Department of Banking and Finance would "`not be made public, unless with the consent of the department.'" Id. at 54. A number of banks filed a declaratory judgment action, asking for a determination of whether the Department could release lists of their stockholders. Id. The Department argued that the legislature had given it such authority. Id. at 54-55. The trial court acknowledged that the literal meaning of the words of the statute appeared to give the Department that power. Id. at 55. However, it concluded that, because the power given to the Department by the legislature violated article II, section 3, of our constitution, the statutory delegation was unconstitutional. Id. Affirming the trial court's holding, our supreme court said:
The legal principal guiding the Circuit Judge in this case and which is dispositive of the issue under consideration is so well known as to be deemed "hornbook" law. This Court has held in a long and unvaried line of cases that statutes granting power to administrative agencies must clearly announce adequate standards to guide the agencies in the execution of the powers delegated. The statute must so clearly define the power delegated that the administrative agency is precluded from acting through whim, showing favoritism, or exercising unbridled discretion.
*458 Id. at 55-56 (citations omitted). Accord Dickinson v. State, 227 So.2d 36, 37-38 (Fla.1969); High Ridge Mgmt. Corp. v. State, 354 So.2d 377, 380 (Fla.1977); Fla. Home Builders Ass'n v. Div. of Labor, Bureau of Apprenticeship, 367 So.2d 219, 220 (Fla.1979); In re Advisory Opinion to the Governor, 509 So.2d 292, 311 (Fla.1987).
Our supreme court has recently reaffirmed Lewis. In Bush v. Schiavo, 885 So.2d 321 (Fla. Sept. 23, 2004), the court unanimously struck down a statute which it concluded delegated "unfettered discretion" to the governor. In doing so, the court said:
[U]nder article II, section 3 of the constitution the Legislature "may not delegate the power to enact a law or the right to exercise unrestricted discretion in applying the law."... This prohibition, known as the nondelegation doctrine, requires that "fundamental and primary policy decisions ... be made by members of the legislature who are elected to perform those tasks, and [that the] administration of legislative programs must be pursuant to some minimal standards and guidelines ascertainable by reference to the enactment establishing the program." ... In other words, statutes granting power to the executive branch "must clearly announce adequate standards to guide ... in the execution of the powers delegated. The statute must so clearly define the power delegated that the [executive] is precluded from acting through whim, showing favoritism, or exercising unbridled discretion."...
Id. at S518.
The second sentence of section 101.253(2) reads: "The Department of State may in its discretion allow such a candidate to withdraw after the 42nd day before an election upon receipt of a written notice, sworn to under oath, that the candidate will not accept the nomination or office for which he or she qualified." Clearly, the subsection includes no criteria which provide standards to guide the Department in the exercise of the power delegated. In this sense, it is indistinguishable from the statute stricken in Lewis. However, the Division argues that such standards may be found by reading the "Florida Election Code." We find this argument disingenuous at best. It is true that, in appropriate circumstances, courts may read related statutes to determine whether sufficient standards have been pronounced by the legislature. E.g., Apalachee Reg'l Planning Council v. Brown, 546 So.2d 451, 453 (Fla. 1st DCA 1989), approved, 560 So.2d 782 (Fla.1990). However, section 97.011, Florida Statutes (2004), tells us that the term "Florida Election Code" refers to "[c]hapters 97-106 inclusive" of the Florida Statutes. While we have not personally accepted the Division's invitation to read those ten chapters, comprising some 124 pages, in an attempt to mine from them the standards intended to limit the Department's discretion, we doubt very much that prior decisions of our supreme court would require such a Herculean effort.
Because the second sentence of section 101.253(2) vests unbridled discretion in the Department, we hold that it violates article II, section 3 of our constitution and is, therefore, unconstitutional. Were we to sever that sentence from the first, we would create an irreconcilable conflict between the remaining sentence of subsection (2) and subsection (3), and possibly between subsection (2) and section 100.111(4)(b) as well. Accordingly, we hold that subsection (2) is unconstitutional in its entirety.
Having declared section 101.253(2) unconstitutional, there is no other provision *459 which purports to limit a nominee's right to withdraw from the election. That being the case, Stork's withdrawal must be recognized, and resort must then be had to section 100.111(4)(b) for the applicable procedure to be employed for the selection of a replacement nominee. Because this is the result reached by the trial court, we affirm its "Final Order Granting Temporary and Permanent Injunction."
AFFIRMED.
DAVIS and POLSTON, JJ., CONCUR.